# No. 18-16663

IN THE

# United States Court of Appeals

FOR THE NINTH CIRCUIT

CITY OF OAKLAND, a Municipal Corporation, and The People of the State of California, acting by and through the Oakland City Attorney Barbara J. Parker; and CITY AND COUNTY OF SAN FRANCISCO, a Municipal Corporation, and The People of the State of California, acting by and through the San Francisco City Attorney Dennis J. Herrera
*Plaintiffs-Appellants*

*v.*

B.P. P.L.C., a public limited company of England and Wales; CHEVRON CORPORATION, a Delaware corporation; CONOCOPHILLIPS, a Delaware corporation; EXXON MOBIL CORPORATION, a New Jersey corporation; ROYAL DUTCH SHELL PLC, a public limited company of England and Wales; and DOES, 1through 10
*Defendants-Appellees*

No. 3:17-cv-06011-WHA
No. 3:17-cv-06012-WHA
On Appeal from The U.S. District Court, Northern District of California
Hon. William H. Alsup

**BRIEF OF THE NATIONAL LEAGUE OF CITIES; THE U.S. CONFERENCE OF MAYORS; AND THE INTENRATIONAL MUNICIPAL LAWYERS ASSOCIATION AS *AMICUS CURIAE* IN SUPPORT OF PLAINTIFFS-APPELLANTS AND REVERSAL**

Michael Burger
MORNINGSIDE HEIGHTS LEGAL SERVICES, INC.
Columbia Environmental Law Clinic
435 W. 116th St.
New York, NY 10027
212-854-2372
*Counsel for Amici Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, the National League of Cities, the U.S. Conference of Mayors and the International Municipal Lawyers Association ("Local Government Amici"), by and through their undersigned attorney, hereby certify that they each have no parent corporation and that no publicly held corporation owns 10% or more of any of their stock.

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT........................................................i

TABLE OF AUTHORITIES..........................................................................iii

STATEMENT OF IDENTIFICATION...................................................1

BACKGROUND..............................................................................................4

ARGUMENT.....................................................................................................9

I. THERE ARE NO “UNIQUELY FEDERAL INTERESTS” AT STAKE IN THIS CASE SUFFICIENT TO REQUIRE CONVERSION OF PLAINTIFFS’ STATE LAW CLAIM INTO FEDERAL LAW CLAIMS…………………………………..……9

II. THE DISPLACEMENT OF A FEDERAL COMMON LAW CAUSE OF ACTION FOR NUISANCE REQUIRES THE STATE LAW CAUSE OF ACTION TO BE TREATED ON ITS OWN TERMS...14

CONCLUSION...........................................................................................17

CERTIFICATE OF SERVICE…………………………………………………19

CERTIFICATE OF COMPLIANCE……………………………………...…20

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Abbatiello v. Monsanto Co.*,
522 F. Supp. 2d 524 (S.D.N.Y. 2007)....................................................................7

*Am. Elec. Power, Co. v. Connecticut*
564 U.S 410 (2011)..........................................................................................14, 15

*Am. Fuel & Petrochemical Manufacturers v. O'Keeffe*,
903 F.3d 903 (9th Cir. 2018)……………………………………..……....10, 12

*California v. General Motors Corp.*,
2007 WL 2726871 (N.D. Cal. Sept. 17, 2007).....................................................16

*City of Chicago v. Am. Cyanamid Co.*,
823 N.E.2d 126 (Ill. App. Ct. 2005)......................................................................6

*City of Cincinnati v. Beretta U.S.A. Corp.*,
768 N.E.2d 1136, 1142 (Ohio 2002)………………………………………...5

*City of Gary v. Smith & Wesson Corp.*,
801 N.E.2d 1222 (Ind. 2003)..................................................................................5

*City of Milwaukee v. Illinois*,
451 U.S. 304 (1981)..............................................................................................15

*City of Milwaukee v. NL Indus.*,
762 N.W.2d 757 (Wis. Ct. App. 2008)...................................................................6

*City of New York v. BP P.L.C.*,
325 F. Supp. 3d 466 (S.D.N.Y. 2018)……………………..……………………...7

*City of New York v. BP P.L.C.*,
No. 18-2188 (2d Cir. July 26, 2018)……………………..……………………….....7

*City of Portland v. Monsanto Co.*,
2017 WL 4236583 (D. Or. Sept. 22, 2017)…………………………..………...6

*City of Spokane v. Monsanto Co.*,
2016 WL 6275164 (E.D. Wa. Oct. 26, 2016)…………………………..………7

*City of St. Louis v. Benjamin Moore & Co.*,
226 S.W.3d 110 (Mo. 2007)..........................................................................6

*Cleveland v Ameriquest*,
621 F. Supp. 2d 513 (N.D. Ohio 2009)..............................................................6

*Coal. for Competitive Elec. v. Zibelman*,
272 F. Supp. 3d 554 (S.D.N.Y. 2017)..............................................................12

*Coal. for Competitive Elec., Dynergy Inc. v. Zibelman*,
906 F.3d 41 (2d Cir. 2018)……………………………………………………12

*Columbia Pac. Bldg. Trades Council v. City of Portland*,
412 P.3d 258 (Or. Ct. App. 2018).......................................................................12

*Comer v. Murphy Oil USA*,
585 F.3d 855 (5th Cir. 2009)..........................................................................14, 17

*Comer v. Murphy Oil USA*,
607 F.3d 1049 (5th Cir. 2010)……………………………………..…………17

*ConAgra Grocery Prod. Co. v. California*,
2018 WL 3477388 (U.S. Oct. 15, 2018)...........................................................6

*Connecticut v. Am. Elec. Power Co.*,
582 F.3d 309 (2d Cir. 2009)…………………………………………………14

*County of San Mateo et al. v. Chevron Corp.*,
294 F.Supp.3d 934 (N.D.CA 2018)……………………………...……………16

*Electric Power Supply Association v. Star*,
904 F.3d 518 (7th Cir. 2018)..........................................................................12

*Energy and Env't Legal Inst. v. Epel*,
43 F. Supp. 3d 1171 (D. Colo. 2014).............................................................12

*In re Comer*,
562 U.S. 1133 (2011).......................................................................................14

*In re Lead Paint Litig.*,
924 A.2d 484 (N.J. Sup. Ct. 2007)...................................................................6

*In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*,
725 F.3d 65 (2d Cir. 2013).................................................................................6

*In re: National Prescription Opiate Litigation*,
1:17-MD-2804 (N.D. Ohio Dec. 8, 2017)..........................................................6

*Int'l Paper Co. v. Ouellette*,
479 U.S. 481 (1987).........................................................................................15

*Little v. Louisville Gas & Elec. Co.*,
805 F.3d 695 (6th Cir. 2015)...........................................................................15

*Merrick v. Diageo Ams. Supply, Inc.*,
805 F.3d 685 (6th Cir. 2015)...........................................................................15

*N.Y. Trap Rock Corp. v. Town of Clarkstown*,
299 N.Y. 77, 85 N.E.2d 873 (1949)...................................................................4

*Native Vill. of Kivalina v. ExxonMobil Corp.*,
696 F.3d 849 (9th Cir. 2012)......................................................................15, 16

*Native Vill. of Kivalina v. Exxon Mobil Corp.*,
663 F. Supp. 2d 863 (N.D. Cal. 2009)....................................................................16

*People v. ConAgra Grocery Prod. Co.*,
227 Cal. Rptr. 3d 499 (Ct. App. 2017)..................................................................6

*Rocky Mtn. Farmers v. Corey*,
730 F.3d 1070 (9th Cir. 2013).............................................................................12

*Rocky Mtn. Farmers v. Corey*,
2019 WL 254686 (9th Cir. Jan. 19 2019)………..……………………………....12

*Sherwin-Williams Co. v. California*,
2018 WL 3477401 (U.S. Oct. 15, 2018) ................................................................6

*State v. Lead Indus., Ass'n, Inc.*,
951 A.2d 428 (R.I. 2008)........................................................................................6

*Tex. Indus., Inc. v. Radcliff Materials, Inc.*,
451 U.S. 630 (1981)..............................................................................................10

*White v. Smith & Wesson Corp.*,
97 F. Supp. 2d 816 (N.D. Ohio 2000)....................................................................6

**STATUTES**

Cal. Health & Safety Code § 38501.....................................................................10

N.Y. Community Risk and Resiliency Act, Assemb. B. A6558A;
S.B. S6617A 2014 N.Y. Sess. Laws Ch. 355 (S. 6617-B)
(McKinney) 335.....................................................................................................11

Or. Rev. Stat. § 468A.200(3)………………………………….………………….…11

## OTHER AUTHORITIES

2 M. Keely et al., *Ch. 11: Built Environment, Urban System, and Cities* in Impacts, Risks, and Adaptation in the United States: The Fourth National Climate Assessment (D.R. Reidmiller et al. eds., 2018)…………………..………………2

Center for Climate and Energy Solutions, State Climate Policy Maps, https://www.c2es.org/content/state-climate-policy/ (last visited Jan. 24, 2019)….11

Sarah L. Swan, *Plaintiff Cities*, 71 Vand. L. Rev. 1227 (2017)..........................................................................5

William L. Prosser, *Private Action for Public Nuisance*, 52 Va. L. Rev. 997 (1966)............................................................................4

## STATEMENT OF IDENTIFICATION[1]

Local Government Amici comprise three of the nation's leading local government associations. The National League of Cities (NLC) is the oldest and largest organization representing municipal governments throughout the United States. Its mission is to strengthen and promote cities as centers of opportunity, leadership, and governance. Working in partnership with forty-nine State municipal leagues, NLC serves as a national advocate for more than 19,000 cities and towns, representing more than 280 million Americans. Its Sustainable Cities Institute serves as a resource hub for climate change mitigation and adaptation for cities. The U.S. Conference of Mayors (USCM) is the official non-partisan organization of U.S. cities with a population of more than 30,000 people (approximately 1,400 cities in total). USCM is home to the Mayors Climate Protection Center, formed to assist with implementation of the Mayors Climate Protection Agreement. The International Municipal Lawyers Association (IMLA) is a nonprofit, nonpartisan professional organization consisting of more than 2,500 members. The membership is composed of local government entities, including cities and counties, and

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), *amici* states that no party's counsel authored this brief, and no party, party's counsel, or person other than *amici* or its members or counsel contributed financial support intended to fund the preparation or submission of this brief.

subdivisions thereof, as represented by their chief legal officers, state municipal leagues, and individual attorneys. IMLA serves as an international clearinghouse of legal information and cooperation on municipal legal matters. Established in 1935, IMLA is the oldest and largest association of attorneys representing United States municipalities, counties, and special districts.

Over eighty percent of Americans now live in urban areas, and even more of them work there; as a consequence, Local Government Amici's members are responsible for understanding the risks to and planning for the wellbeing of the great majority of Americans. The concentration of people, activity, and infrastructure in cities makes them uniquely valuable economically. It also serves to compound the adverse impacts of a host of climatic changes, including sea level rise; increasingly frequent and severe storms that pose immediate threats to human life and critical infrastructure; damaged and disappearing coastlines; degraded ecosystems and reduced ecosystem services function; increases in heat-related deaths; poor air quality and exacerbated health problems; longer droughts that combine with increased temperatures and water evaporation rates to strain water supplies; and heightened wildfire risk. *See* 2 M. Keely, et al., *Ch. 11: Built Environment, Urban System, and Cities* in Impacts, Risks, and Adaptation in the United States: The Fourth National Climate Assessment, Vol. II 444—447 (D.R. Reidmiller, et al., eds., 2018).

Local Government Amici have an interest in the Court's proper recognition of the existence and availability of state public nuisance claims for climate change impacts. The district court's demand that Plaintiffs' state public nuisance claims be converted to federal public nuisance claims and the subsequent dismissal of those converted federal public nuisance claims threatens to intrude upon municipal governments' authority, within our federalist system, to rely on state law to seek redress for harms that, in a contemporary world defined by complex economic and environmental systems that transcend multiple borders, arise in significant part beyond their jurisdictions but nonetheless have highly localized impacts.

This Court should reverse the Order Denying Motions to Remand and sustain the viability of those state law claims. This reversal would effectively negate the district court's other orders, and require no further action from this Court. Alternatively, if the Court determines that the district court does have subject matter jurisdiction over the case, it should reverse the district court's decision to dismiss the case on displacement and separation of powers grounds, in particular those aspects of the Order Granting Motion to Dismiss that pertain to Plaintiffs' state law claims. In addition, if the Court reaches the issue it should reverse the Order Granting Motions to Dismiss for Lack of Personal Jurisdiction. The district court's newfound test for specific jurisdiction places an impossible burden on cities seeking to use nuisance to address harms from activities that cross jurisdictional boundaries.

Local Government Amici file this brief pursuant to Rule 29(a) of the Federal Rules of Appellate Procedure, and all parties to the appeal have consented to the filing of this brief.

## BACKGROUND

State public nuisance law provides an important means for cities and local governments to seek abatement of and damages for localized harms arising from activities that cross jurisdictional boundaries, as well as justice for their residents suffering those harms, including their most vulnerable populations. Cities have, for instance, long employed state public nuisance to address conduct offensive to the community, from environmental pollution to red light districts, as an exercise of their inherent and reserved police power. *See* William L. Prosser, *Private Action for Public Nuisance*, 52 Va. L. Rev. 997 (1966) (tracing the history of public nuisance). As the New York Court of Appeals noted some 80 years ago, in a statement emblematic of conditions nationwide:

> "[W]here the public health is involved, the right of the town to bring such an action to restrain a public nuisance may be tantamount to its right of survival… [I]t is clear that a public nuisance which injures the health of the citizens of a municipality imperils the very existence of that municipality as a governmental unit. The right to exist necessarily implies the right to take such steps as are essential to protect existence."

*N.Y. Trap Rock Corp. v. Town of Clarkstown*, 299 N.Y. 77, 84, 85 N.E.2d 873, 877-78 (1949). In this long history courts have always played a crucial role, balancing competing interests to determine where there has been an "unreasonable

interference" with a public right. State and federal legislation addressing particular social problems has undoubtedly reduced the domain of public nuisance, but it has not eliminated it. Indeed, state public nuisance continues to play a vital role for cities, allowing cities to play a *parens patriae*-like role on behalf of their residents, and offering an opportunity to hold private actors accountable for harms that result from their products and activities.

Cities' use of state public nuisance claims to address cross-jurisdictional issues began more than three decades ago, when cities joined state attorneys general litigating asbestos and tobacco claims.[2] *See* Sarah L. Swan, *Plaintiff Cities*, 71 Vand. L. Rev. 1227, 1233 (2017). In the mid-1990s, cities again sought to protect their residents by suing the gun industry, invoking state public nuisance, among other claims. *See, e.g.*, *City of Gary v. Smith & Wesson Corp.*, 801 N.E.2d 1222, 1227 (Ind. 2003) (upholding claims for public nuisance, negligent sale, negligent design, and misleading and deceptive advertising); *City of Cincinnati v. Beretta U.S.A. Corp.*, 768 N.E.2d 1136, 1142 (Ohio 2002) (upholding claims for public nuisance, negligence, negligent design, and failure to warn); *White v. Smith & Wesson Corp.*,

---

[2] New York City, San Francisco, and Los Angeles, along with Cook County, Illinois, and Erie County, New York, all joined the 1998 Master Settlement Agreement. *See* Nat'l Ass'n of Attorneys Gen., Master Settlement Agreement, exh. N, at http://www.naag.org/assets/redesign/files/msa-tobacco/MSA.pdf (last visited Nov. 14, 2018).

97 F. Supp. 2d 816, 829 (N.D. Ohio 2000) (allowing public nuisance and negligent design claims). Another decade later, cities pursued state public nuisance claims to abate the harms caused by the gasoline additive MTBE and lead paint. *See, e.g.*, *In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, 725 F.3d 65, 121 (2d Cir. 2013); *People v. ConAgra Grocery Prod. Co.*, 227 Cal. Rptr. 3d 499, 598 (Ct. App. 2017), *reh'g denied* (Dec. 6, 2017), *review denied* (Feb. 14, 2018), *cert. denied sub nom. ConAgra Grocery Prod. Co. v. California*, 2018 WL 3477388 (U.S. Oct. 15, 2018), and *cert. denied sub nom. Sherwin-Williams Co. v. California*, 2018 WL 3477401 (U.S. Oct. 15, 2018); *City of Milwaukee v. NL Indus.*, 762 N.W.2d 757, 770 (Wis. Ct. App. 2008); *State v. Lead Indus., Ass'n, Inc.*, 951 A.2d 428, 458 (R.I. 2008); *In re Lead Paint Litig.*, 924 A.2d 484, 503 (N.J. Sup. Ct. 2007); *City of St. Louis v. Benjamin Moore & Co.*, 226 S.W.3d 110, 116 (Mo. 2007); *City of Chicago v. Am. Cyanamid Co.*, 823 N.E.2d 126, 140 (Ill. App. Ct. 2005). In recent years, cities have brought similar cases against financial institutions for the consequences of the subprime mortgage crisis, against pharmaceutical companies to help carry the costs needed to address the opioid epidemic, and against Monsanto to compensate for harms from PCB contamination. *See, e.g.*, *In re: National Prescription Opiate Litigation*, 1:17-MD-2804 (N.D. Ohio Dec. 8, 2017); *Cleveland v Ameriquest*, 621 F. Supp. 2d 513, 536 (N.D. Ohio 2009); *City of Portland v. Monsanto Co.*, 2017 WL 4236583 (D. Or. Sept. 22, 2017); *City of Spokane v. Monsanto Co.*, 2016 WL

6275164 (E.D. Wa. Oct. 26, 2016)*; Abbatiello v. Monsanto Co.*, 522 F. Supp. 2d 524, 541 (S.D.N.Y. 2007).

All of these cases involved claims under state law, and *none* of them saw a state law claim converted into a federal claim, much less converted into a federal claim for the purpose of conferring federal jurisdiction, only to be dismissed on displacement and separation of powers grounds. In this respect, the district court's decision stands in opposition to a consistent body of jurisprudence that has sustained the availability of state claims for complex cases like this one. (The only other decision consistent with the district court's is *City of New York v. BP P.L.C.*, 325 F. Supp. 3d 466, 1028 (S.D.N.Y. 2018), *appeal docketed*, *City of New York v. BP P.L.C.*, No. 18-2188 (2d Cir. July 26, 2018), which adopts the same basic reasoning as the district court.)

The district court's decisions warrant reversal. As Plaintiffs argue, the decision to deny remand was without basis. This is a case against product manufacturers that sounds in nuisance under California state law and, in light of those manufacturers' conduct, seeks to recover costs expended by Plaintiffs to address foreseeable harms suffered as a result of the intended use of their products. It is indistinguishable from a solid body of case law allowing such claims to be raised against national and international manufacturers and retailers of numerous products, which are subject to multiple layers of regulation, and which were also used as

intended but produced significant harms nonetheless. This is not a case about regulating greenhouse gas emissions in other states, or controlling federal fossil fuel leasing programs on public lands, or dictating foreign governments' climate policies or energy regimes. This case raises a textbook nuisance claim, seeking to allocate fairly a portion of the significant costs required to protect city residents from harms inflicted by Defendants' products. Put differently: the case does not arise under federal law, does not involve "uniquely federal interests," is not completely preempted, and does not fit into any other category that might support removal. Ultimately, uniform adjudication of the financial burdens cities bear for climate change adaptation measures might be desirable, as the district court suggests; but it is not legally necessary. The district court erred in finding it had jurisdiction to consider the federal claim it created.

Moreover, should this Court affirm the district court's decision that federal common law necessarily applies, and that removal was therefore proper, it should reverse the district court's order dismissing Plaintiffs' nuisance claims on displacement and separation of powers grounds because where a federal common law claim might lie, its displacement by federal legislation revives the parallel state claim. As Plaintiffs further argue in their brief, their state claims do not seek to apply state law in foreign jurisdictions, do not intrude on foreign affairs, and are not preempted by federal statute.

In addition, though Local Government Amici do not address the issue in depth and instead refer the Court to Plaintiffs' brief on the matter, this Court should reverse the district court's decision to dismiss the cases for lack of personal jurisdiction. The district court interpreted this circuit's test for specific jurisdiction to require Plaintiffs allege that the entirety of their harms arise from each individual Defendant's activities solely within the state. This is incorrect, and would present an insurmountable obstacle in many instances involving transboundary harm. What's more, the district court assumed that it would be impossible for Plaintiffs to prove but-for causation; however, causation in this case is a question best resolved through trial.

## ARGUMENT

### I. THERE ARE NO "UNIQUELY FEDERAL INTERESTS" AT STAKE IN THIS CASE SUFFICIENT TO REQUIRE CONVERSION OF PLAINTIFFS' STATE LAW CLAIMS INTO FEDERAL LAW CLAIMS

The district court wrongly concluded that, because of the transboundary nature of anthropogenic climate change, there are "uniquely federal interests" at issue in this case, requiring that the nuisance claims be treated solely as a matter of federal law. Yet the Supreme Court has described cases involving such "uniquely federal interests" as those "narrow areas [that are] . . . concerned with the rights and obligations of the United States, interstate and international disputes implicating the

conflicting rights of States or our relations with foreign nations, and admiralty cases." *Tex. Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 641 (1981) (citation omitted). As Plaintiffs persuasively argue in their brief, this case invokes none of those concerns. This holds true whether the Court considers these issues as a matter of whether Plaintiffs' claims arise under federal common law, whether they raise disputed and substantial federal issues, or whether they are completely preempted.

The reasoning underlying the district court's conclusion that there are "uniquely federal interests" at stake in this matter would, if adopted by this Court, pose a risk to cities and counties across the country. If endorsed, such reasoning could empower federal common law to hold domain over a broad swath of policy areas, and federal courts to claim jurisdiction over a wide array of state law claims, subverting cities' and other local governments' ability to rely on traditional legal tools in state courts to pursue remedies for environmental harms, among other things.

This potential outcome is especially worrisome in the context of climate change. Climate change directly impacts subnational governmental interests. *See e.g., Am. Fuel & Petrochemical Manufacturers v. O'Keeffe*, 903 F.3d 903, 913 (9th Cir. 2018) ("states have a legitimate interest in combating the adverse effects of climate change on their residents"). *See also*, Cal. Health & Safety Code § 38501(2017) (finding that greenhouse gas emissions are degrading the State's air

quality, reducing the quantity and quality of available water, increasing risks to public health, damaging the State's natural environment and causing sea levels to rise); Or. Rev. Stat. § 468A.200(3) (finding that "Global warming poses a serious threat to the economic well-being, public health, natural resources and environment of Oregon"); N.Y. Community Risk and Resiliency Act, Assemb. B. A6558A; S.B. S6617A 2014 N.Y. Sess. Laws Ch. 355 (S. 6617-B) (McKinney) 335 (requiring that state environmental agency adopt science-based sea-level rise projections into regulation and that applicants for permits or funding in a number of specified programs demonstrate that future physical climate risk due to sea-level rise, storm surge and flooding have been considered). As a result, States have taken a wide array of actions to combat climate change, including adopting adaptation or resilience plans. These efforts require the expenditure of significant funds and use of public resources. *See* Center for Climate and Energy Solutions, State Climate Policy Maps, https://www.c2es.org/content/state-climate-policy/ (last visited March 5, 2019).

Cities have also been at the forefront of climate action. At last count, 1,060 mayors have joined the U.S. Conference of Mayors' Climate Protection Agreement. Some 280 cities and counties have joined the "We Are Still In" coalition, a group of more than 3,600 mayors, county executives, governors, tribal leaders, college and university leaders, businesses, faith groups, and investors who have committed to take action consistent with the United States' Paris Agreement

commitments. National and transnational peer networks such as Climate Mayors, Carbon Neutral Cities Alliance, C40, and ICLEI – Local Governments for Sustainability have been formed to provide cities, city political leaders, and city agency staff with support and capacity to take on climate change challenges.

Importantly, courts have routinely upheld subnational climate actions in the face of challenges that they interfere with national interests or priorities and affirmed the legitimacy of subnational interests in climate action. *See, e.g.*, *Am. Fuel & Petrochemical Manufacturers v. O'Keeffe, supra* (upholding Oregon's low carbon fuel standard against dormant commerce clause challenge); *Rocky Mtn. Farmers v. Corey*, 2019 WL 254686 (9th Cir. Jan. 19 2019) (upholding California's low carbon fuel standard against preemption and dormant commerce clause challenge and noting it reflects "legitimate state interest"); *Rocky Mtn. Farmers v. Corey*, 730 F.3d 1070, 1106–07 (9th Cir. 2013) (same); *Electric Power Supply Association v. Star*, 904 F.3d 518 (7th Cir. 2018) (upholding Illinois promoting zero-carbon energy sources against dormant commerce cause and preemption by the Federal Power Act); *Coal. for Competitive Elec. v. Zibelman*, 272 F. Supp. 3d 554, 559 (S.D.N.Y. 2017) (holding New York State program promoting zero-carbon energy sources did not violate dormant commerce cause), *aff'd* 906 F.3d 41 (2d Cir. 2018); *Energy and Env't Legal Inst. v. Epel*, 43 F. Supp. 3d 1171 (D. Colo. 2014) (finding Colorado renewable energy mandate did not violate dormant commerce clause). *Cf. Columbia*

*Pac. Bldg. Trades Council v. City of Portland*, 412 P.3d 258 (Or. Ct. App. 2018) (holding zoning ordinance banning new and expanded fossil fuel export terminals did not violate dormant commerce clause but not reaching whether reducing greenhouse gasses is a legitimate local interest due to other interests supporting city's decision).

This consistent treatment by the courts of state and local efforts affirms that global climate change is also a local problem, requiring local solutions. As discussed in Part II below, courts have also, until now, upheld the availability of state law claims for climate harms. This Court should put this case back in line with that precedent.

## II. THE DISPLACEMENT OF A FEDERAL COMMON LAW CAUSE OF ACTION FOR NUISANCE REQUIRES THE STATE LAW CAUSE OF ACTION BE TREATED ON ITS OWN TERMS

As Plaintiffs argue in their brief, the district court erred in dismissing the complaint based on its holding that federal common law claims were displaced by the Clean Air Act, to the extent they sought redress for domestic activities, and barred by separation of powers principles, to the extent they sought redress for activities in other countries.

With respect to separation of powers, it bears noting that the two U.S. Courts of Appeals that have addressed the justiciability issue directly have held that there is nothing non-justiciable about state and federal common law claims relating to climate change. *Comer v. Murphy Oil USA*, 585 F.3d 855, 860 (5th Cir. 2009) (*Comer I*) *petition for writ of mandamus denied sub nom. In re Comer*, 562 U.S. 1133 (2011); *Connecticut v. Am. Elec. Power Co.*, 582 F.3d 309 (2d Cir. 2009), *rev'd on other grounds*, *Am. Elec. Power Co. v. Connecticut*, 564 U.S. 410 (2011) (*AEP*).

However, the court's error regarding the relationship between displacement and the viability of state common law claims is of even greater concern to Local Government Amici. The Supreme Court, as all parties to the present litigation acknowledge, directly addressed the displacement of federal public nuisance in *AEP*, explaining that "the Clean Air Act and the EPA actions it authorizes displace any

federal common law right to seek abatement" of GHG emissions. 564 U.S. at 424. The Ninth Circuit, following this precedent, held "if a cause of action is displaced, displacement is extended to all remedies," including damages. *Native Vill. of Kivalina v. ExxonMobil Corp.*, 696 F.3d 849, 857 (9th Cir. 2012) (*Kivalina*). Neither *AEP* nor *Kivalina* foreclosed a public nuisance claim based on state law.

Indeed, they did just the opposite. The Supreme Court's express view is that the existence of a federal common law claim that has been displaced by federal legislation does *not* erase the possibility of state law claims; rather, it converts the availability of state claims into an ordinary question of statutory preemption. *See City of Milwaukee v. Illinois*, 451 U.S. 304, 327-329 (1981); *Int'l Paper Co. v. Ouellette*, 479 U.S. 481 (1987). Accordingly, in her opinion for a unanimous court in *AEP*, Justice Ginsburg wrote, "In light of our holding that the Clean Air Act displaces federal common law, the availability *vel non* of a state lawsuit depends, *inter alia*, on the preemptive effect of the federal Act." *AEP*, 564 U.S. at 429. *See also Merrick v. Diageo Ams. Supply, Inc.*, 805 F.3d 685, 690 (6th Cir. 2015) and *Little v. Louisville Gas & Elec. Co.*, 805 F.3d 695, 698 (6th Cir. 2015) (state common law nuisance for interstate pollution not preempted by Clean Air Act).

This Court's decision in *Kivalina* further supports proceeding on state law claims in this case. Discussing the supplemental state law claims filed there, the Ninth Circuit panel noted that the district court had declined to exercise

supplemental jurisdiction and dismissed the claim without prejudice to re-file in state court. 696 F.3d at 854-55. *See also Native Vill. of Kivalina v. ExxonMobil Corp.*, 663 F. Supp. 2d 863, 882 (N.D. Cal. 2009) (stating that a federal court "may decline to exercise supplemental jurisdiction over a claim if it has dismissed all claims over which it has original jurisdiction"), *aff'd* 696 F.3d 849, 857 (9th Cir. 2012); *California v. General Motors Corp.*, No. 06-cv-05755, 2007 WL 2726871 (N.D. Cal. Sept. 17, 2007) (dismissing federal climate change nuisance claim on political questions grounds and declining to exercise jurisdiction over pendent state nuisance claim). The concurrence in *Kivalina* stated unequivocally that "[d]isplacement of the federal common law does not leave those injured by air pollution without a remedy," and suggested state nuisance law as "an available option to the extent it is not preempted by federal law." 696 F.3d at 866 (Pro, J., concurring). Here, there can be no such preemption because federal law does not address climate change adaptation damages or Defendants' product design and marketing activities, and therefore cannot preempt Plaintiffs' claims.

In any event, as Judge Chhabria held in the similar case of *County of San Mateo et al. v. Chevron Corp.*, state courts are "entirely capable of adjudicating" whether state laws claims are preempted by federal law. 294 F.Supp.3d 934, 938 (N.D.CA 2018); the possibility of preemption does not result in the erasure of the cause of the action.

The Supreme Court jurisprudence, echoed by this Court, is also consistent with the original Fifth Circuit panel's 2009 opinion in *Comer I*. There, plaintiffs seeking damages for injuries suffered as a result of Hurricane Katrina had invoked federal jurisdiction based on diversity. The Fifth Circuit panel found that a diversity suit brought under state law for damages was materially distinguishable from public nuisance claims brought under federal law and sustained the claims. 585 F.3d at 878-79. (The decision was subsequently vacated when the Fifth Circuit granted rehearing *en banc*; the Fifth Circuit then failed to muster a quorum for the rehearing, thereby effectively reinstating the district court's decision as a matter of law. *Comer v. Murphy Oil USA*, 607 F.3d 1049 (5th Cir. 2010).)

The district court's determination that Plaintiffs' state law claims must be converted into federal law claims should be rejected. Even if this Court were to accept that there is a federal common law claim that could apply in this context, its displacement would demand the state law claims be heard on their own terms.

## CONCLUSION

For the foregoing reasons, Local Government Amici urge this Court to reverse the Order Denying Motions to Remand, or, in the alternative, to reverse the Order Granting Motion to Dismiss and the Order Granting Motions to Dismiss for Lack of Personal Jurisdiction, and remand the case for further proceedings.

Dated: March 20, 2019

Respectfully submitted,

s/ Michael Burger
Michael Burger, Of Counsel
Morningside Heights Legal Services, Inc.
Columbia Environmental Law Clinic
435 W. 116th St.
New York, NY 10027
212-854-2372
*Counsel for Amici Curiae*

FOR THE NATIONAL LEAGUE OF CITIES

Clarence E. Anthony
CEO and Executive Director
National League of Cities
660 North Capitol Street NW
Suite 450
Washington, DC 20001
202-626-3000

FOR THE U.S. CONFERENCE OF MAYORS

Tom Cochran
CEO and Executive Director
The U.S. Conference of Mayors
1620 I Street NW
4th Floor
Washington, DC 20006
202-293-7330

FOR THE INTERNATIONAL MUNICIPAL LAWYERS ASSOCIATION

Charles W. Thompson, Jr.
General Counsel and Executive Director
International Municipal Lawyers Association
51 Monroe Street, Suite 404
Rockville, MD 20850
202-466-5424

## CERTIFICATE OF SERVICE

I hereby certify that on March 20, 2019, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

Dated: March 20, 2019

s/ Michael Burger
Michael Burger
*Counsel for Amici Curiae*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 29(a)(5) and 32(a)(7)(B) because it contains 3,946 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Microsoft Word 2016 in Times New Roman 14-point font, a proportionally spaced typeface.

Dated: March 20, 2019

s/ Michael Burger
Michael Burger
*Counsel for Amici Curiae*